AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

United States of America
v.

ADRIAN APODACA,
a/k/a Skitz

*Defendant(s)*

Case No. 16-6469-S NOW

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __10/05/2016 through 10/28/2016__ in the county of __Broward__ in the __Southern__ District of __Florida, and elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Attempted Possession with Intent to Distribute a Controlled Substance |
| 18 U.S.C. § 1958 | Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence |
| 18 U.S.C. § 922(g)(1) | Possession of Ammunition by a Convicted Felon |

This criminal complaint is based on these facts:

See attached Affidavit of FBI Special Agent Stephanie M. Viegas.

☑ Continued on the attached sheet.

*Complainant's signature*

Stephanie M. Viegas, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/28/16

*Judge's signature*

City and state: Ft. Lauderdale, FL

LURANA S. SNOW, U. S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, STEPHANIE M. VIEGAS, Special Agent, Federal Bureau of Investigation, being duly sworn, state the following:

1. I have been a Special Agent of the FBI for more than 19 years, and have been assigned to the Miami Division since July 30, 2006. The statements contained in this affidavit are based on my own personal knowledge, as well as information provided to me by other law enforcement officials and employees of the FBI. I have not included in this Affidavit each and every fact and circumstance known to me, but only the facts and circumstances that I believe are sufficient to establish probable cause to believe that the defendant, ADRIAN APODACA, a/k/a "SKITZ," has committed the offenses of Attempted Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846; Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire, in violation of 18 U.S.C. § 1958; Possession of a Firearm in Furtherance of a Drug Trafficking Crime or Crime of Violence, in violation of 18 U.S.C. § 924(c); and Possession of Ammunition by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

2. On May 4, 2016, FBI Miami opened an investigation into the activities of APODACA, who is a self-professed founding member of the Vinlander Social Club (VSC), a violent national White Supremacist Organization. The case was opened to mitigate any potential threats posed by APODACA and to determine whether he was engaging in criminal activities. APODACA was previously convicted on July 14, 1999 in Madison County, Indiana of the felony offenses of Criminal Confinement, Pointing a Firearm and Resisting Law Enforcement. On June 11, 2012,

APODACA was convicted in Phoenix, Arizona of Felon in Possession of Ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

3. In September 2016, APODACA was introduced into a group of FBI Undercover Employees (UCEs), who were posing as affluent violent members of a criminal organization with white supremacy extremist beliefs. On September 8, 2016, APODACA met the UCEs at a covert undercover warehouse located in Broward County, Florida operated by FBI Miami. During the meeting, APODACA witnessed a payment of money to an associate of the UCEs. During this meeting, APODACA expressed an interest in forming a relationship with the undercover organization.

4. On September 22, 2016, APODACA was invited to a social gathering at a covert location within a trailer park located in Broward County, Florida. During the social event, APODACA was introduced to an undercover agent who was posing as a higher ranking member of the undercover organization (UCE-6361). Once alone with UCE-6361, during a recorded conversation, APODACA related his history with the Vinlander Social Club in Arizona, which he described as a "skinhead group." He stated that they had done "contract work" collecting debts, and that they were fighting with different "cartel groups." APODACA also described an event in which he and his associates had hit a drug house, posing as cops, during which one of his associates "mowed everybody down," resulting in their making close to a million dollars. APODACA stated that, while he was with the Vinlanders in Arizona, they had killed "a lot of people." APODACA again expressed an interest in working with the undercover organization, stating, "Give me an order, I don't question it."

5. On October 5, 2016, APODACA was contacted and asked if he had interest in doing a "job" for the organization. APODACA accepted the job, which involved APODACA transporting and protecting a duffle bag filled with undisclosed contents. APODACA, picked up the bag at the undercover warehouse and, in the company of a UCE (UCE-7390), delivered the bag to an unoccupied Range Rover which was parked in a retail store parking lot in Broward County, Florida. APODACA was paid $200 for his part in this transaction. During the transaction, APODACA stated, during a recorded conversation with UCE-7390, that he was armed with "a big ole blade." While transporting the duffle bag, APODACA told UCE-7390, "and always remember, if any undercovers ever (expletive) like jump on us or anything like that, we can fight them because they didn't identify themselves" as police officers. Following the transaction, APODACA purchased a cellular telephone in order to maintain direct contact with members of the undercover organization.

6. On October 12, 2016, APODACA was paid $200 to assist UCE-7229 by conducting a protection and surveillance mission during a meeting with the purported leader of another criminal organization who owed money to the undercover organization. UCE-7229 met with the purported debtor while APODACA and another UCE observed from a distance. The purported debtor was driving an expensive sports car, but claimed he did not have any money to pay back the organization. When informed of this, APODACA, unsolicited and in recorded statements, offered to steal the debtor's car for the undercover organization and asked to be supplied with a 9mm handgun, hand restraints, and chemical spray. Specifically, APODACA requested a "can of mace, 9mm, (expletive) pair of zip ties," and stated that he would get the debtor's car for the undercover organization.

7. On October 17, 2016, APODACA was paid $300 to help deliver and protect what was represented to him to be nine kilograms of cocaine being moved from the undercover warehouse to a car for high ranking members of another criminal organization. At the warehouse, APODACA was captured on videotape helping take the nine kilograms of purported cocaine out of a duffel bag and hiding them inside of Nike shoe boxes. APODACA then helped load the shoe boxes into a truck, whereupon he and a UCE delivered the boxes in Broward County, Florida to two UCEs who were posing as organized crime associates. During the preparation of the cocaine, UCE-6361 stated that he does not leave fingerprints on cocaine and suggested they both wear gloves during the packing of the drugs. Specifically, during a recorded conversation, UCE-6361 stated "Oh, oh, oh, oh, brother I don't know if you want your fingerprints on..." APODACA stated "I know what you mean." UCE-6361 continued "on cocaine, but I sure as shit don't." APODACA agreed and donned a pair of black latex surgical gloves while he packaged the kilogram-sized bricks.

8. On October 18, 2016, APODACA was introduced to an undercover agent who was posing as the head boss of the undercover organization (UCE-6259). During this recorded meeting, APODACA related some of his history with white supremacist groups, and spoke about some of his activities in Arizona. APODACA stated, "We (expletive) made off with probably close to three million dollars out of a (expletive) drug house (expletive) we were dressed like cops ... Charlie ended up freakin out. Somebody pulled a gun and (expletive) Charlie went nuts and just started killing everybody, so we had to murder everybody there ... Allegedly ... We kept all the money. We kept all their coke. We kept everything." Thereafter, APODACA agreed to conduct a murder for hire. APODACA was informed that the person with whom APODACA had observed meeting with UCE-7229 on October 12, 2016, identified as "Tony," still had not made payment of the money which he owed to the organization and needed to be made an example.

APODACA agreed to murder Tony in return for fraudulent identity papers and $5,000 cash. UCE-6259 stated that Tony was in the State of Georgia and asked what was needed to complete the murder. APODACA stated, "Yeah, I just need to get a silencer, a weapon, a drop off point, a picture." APODACA also requested surveillance and intelligence regarding Tony, stating, "If we can get eyes on him and like find out what his habits are...I wanna find out when he takes a piss. I wanna find out when he (expletives) leaves his house...what his random habits are." APODACA also asked UCE-6259 what type of security Tony has around him and what time he comes home at night. APODACA stated, in referring to Tony, "When he comes home, that's when I'll get his ass," and stated that he is "gonna treat this like it's a, uh, military operative."

9. On October 22, 2016, APODACA provided a hand written list to UCE-7229 detailing the specific items which he needed to commit the murder of Tony. The list included "a good high capacity round handgun w/suppressor, at least 5 – 10+ rnd magazines, Xtreme Penetrator from Lehigh Defense (ammo type)." APODACA also requested a "gas mask," "body armor" and "Bear Off." The handwritten list also included directions to "find out layout of residents or place of activity" and "see what is all around the area for escape routes." The list also included the name and birthdate which APODACA wanted reflected on his new fraudulent identity documents.

10. On the morning of October 28, 2016, UCE-6259 met with APODACA within a vehicle in Broward County, Florida. During a recorded conversation, UCE-6259 handed APODACA a bag containing a gas mask, bullets and a bullet proof vest and instructed APODACA to look and make sure the contents were satisfactory. UCE-6259 explained that the Bear Off which APODACA had requested was with the person running surveillance on the murder target. APODACA explained that he needed two cans - one to draw someone out if he needed to. He

further explained that, once they started coughing, he could pinpoint their position and "get the drop on them." APODACA told UCE-6259 that he brought a backup one with him which he could use in case he gets raided by creating an area where no one could come in or get out. UCE-6259 also explained that he could not get the exact ammunition which APODACA had requested. APODACA opened the box of ammunition and UCE-6259 told him to use the silver ones with hollow points and a special material inside to "do the deed," and to use the other ammunition, which is ball ammo, to go practice shoot at a range if he wanted to. APODACA explained he had wanted the other ammunition, referred to as "penetration," to use in case the target had "drone surveillance." UCE-6259 informed APODACA that he will give him the gun once they get to their destination. UCE-6259 told APODACA that the target will be in possession of five (5) kilograms of cocaine, and asked APODACA to use "persuasive powers" to find out where the cocaine is located. UCE-6259 explained that the cocaine is worth approximately $32,000 per kilogram, and stated that he would make it worthwhile to APODACA. APODACA agreed to this deal. UCE-6259 asked again if APODACA was comfortable with the plan and APODACA again agreed. UCE-6259 handed APODACA $2,500, asked him to count it, and stated that APODACA would get the other $2,500 when the job is completed. UCE-6259 told APODACA that he would also pay for any other costs and expenses, including his hotel room and his food. APODACA asked for a "brass catcher." UCE-6259 told APODACA that he did not include that on the list which APODACA had provided, but that UCE-6259 would get one for him. APODACA then stated that he is worried about "collateral," referring to collateral damage and any other people who may be around. UCE-6259 explained that the target lives alone in the middle of nowhere so there should be no one else around. They discussed how it will look like a "dope rip." APODACA

then put everything back into the trunk of the vehicle and they proceeded to drive to Valdosta, Georgia.

11. On the late afternoon of October 28, 2016, APODACA and UCE-6259 arrived at a hotel in Valdosta, Georgia. They met with a second UCE who was in possession of a Glock 9 mm. pistol (the firing pin of which had been shaved down without the knowledge of APODACA), which was equipped with a silencer that bore an obliterated serial number. All three entered a room at the hotel. The second UCE handed the silencer-equipped pistol to UCE-6259 who, in turn, handed it to APODACA. APODACA began pointing the pistol at various points around the room, aiming through the sites. APODACA acknowledged that this was the type of firearm which he had requested. At some point, APODACA placed the firearm on a table, after which he was arrested.

FURTHER AFFIANT SAYETH NAUGHT.

STEPHANIE M. VIEGAS
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me on this 28th day of October 2016 at Fort Lauderdale, Florida.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE